**BIG LAND INVESTMENT CORPORATION, Appellant,**

v.

**LOMAS & NETTLETON FINANCIAL CORPORATION, Appellee.**

**No. 6154.**

Supreme Court of Alaska.

Jan. 7, 1983.

---

Warren C. Colver, Warren C. Colver & Associates, Anchorage, for appellant.

John C. Siemers, Burr, Pease & Kurtz, Anchorage, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

In 1971, Big Land Investment Corporation, the owner of the then partially completed Gold Rush Hotel in Anchorage, found itself in dire financial straits. It had incurred substantial construction debts and was unable to pay its creditors. According to Big Land's general manager, David Grove, the only viable alternative was to sell the hotel, and the only available purchaser was Cox Enterprises, Inc. ["CEI"]. CEI was able to obtain short-term financing for $1,500,000 of the $1,750,000 purchase price from Lomas & Nettleton Financial Corporation ["L & N"], and Big Land agreed to take back a promissory note secured by a trust deed for the balance of the purchase price, $250,000.[1] L & N also loaned CEI an additional $1,100,000 to complete construction of the hotel.[2]

As a condition to advancing CEI the $2,600,000 needed to purchase the hotel and to complete construction, L & N required that its deed of trust securing payment of its loan have priority over Big Land's trust deed. Big Land and CEI therefore executed a subordination agreement which gave L & N's trust deed priority over Big

---

1. The $250,000 note called for interest at 6% per annum payable annually for five years with a balloon payment of the entire principal in five years.

2. L & N's total interim financing loan was evidenced by a note for $2,600,000 secured by a first deed of trust on the property. The note was payable in full on September 15, 1972, with interest at 11% per annum subject to an increase to 15% per annum in the event CEI could not meet its obligations on the note.

Land's.[3] All parties to the transaction expected that the hotel would be completed within a year or two, and that upon completion the interim financing provided by L & N would be replaced with a twenty-year mortgage financed by Old Colony Cooperative Bank ["Old Colony"].

In addition to the fact that the hotel was not a resounding success, Old Colony's long-term financing fell through in 1975. In 1979, L & N foreclosed and acquired the hotel at the foreclosure sale with an offset bid which approximately equaled the principal and interest then due on its $2,600,000 loan to CEI.[4] Big Land received nothing from the foreclosure sale. It subsequently sued L & N, advancing a variety of claims for relief. Big Land sought either damages from L & N or rescission of the subordination agreement, alleging that L & N had breached express and implied terms of that agreement and had caused the hotel to be foreclosed at a price which was insufficient to satisfy Big Land's $250,000 secured claim. L & N's motion for summary judg-

ment was granted in full. On May 20, 1981, judgment was entered dismissing all of Big Land's claims with prejudice. The instant appeal followed.

### I.

■ For its first specification of error, Big Land asserts that the superior court erred in granting summary judgment against it when there existed genuine issues of fact as to whether L & N had breached duties owed to Big Land. The underlying premise of this specification of error is that L & N owed Big Land a duty to administer its loan to CEI with due care and had a concomitant duty to refrain from engaging in any conduct with CEI which materially increased the risk that CEI would default on the loan. Big Land relies on the judicially-developed doctrine of conditional subordination, which provides that a senior lienholder whose senior status results from a subordination agreement must refrain from taking actions which impair the subordinated lienholder's security.[5]

---

3. L & N was not a party to the subordination agreement, but that agreement was executed for the benefit of L & N. Under the terms of the subordination agreement, Big Land agreed that its deed of trust would be subordinated to the L & N first deed of trust, or to

> any amended, extended, or otherwise changed, or substitute first deed of trust whereby the referenced deed of trust may be replaced, altered, increased in face amount to an amount not to exceed $2,900,000.00 or otherwise changed during the lifetime of the deed of trust herein subordinated.

4. In November 1976, Big Land and L & N initiated separate foreclosure proceedings. CEI sought and obtained an injunction which halted both foreclosures and gave CEI "a reasonable time to straighten up [its] affairs." In May and August of 1977, L & N twice agreed to forbear prosecution of its judicial foreclosure so that CEI could consummate a pending sale of the hotel to a purchaser willing to pay $4,000,000, a price sufficient to have satisfied both Big Land's and L & N's claims. The sale fell through, and Big Land renewed its foreclosure efforts. When the superior court indicated its willingness to allow Big Land to foreclose, CEI immediately filed for bankruptcy, which automatically stayed the foreclosure. The bankruptcy court subsequently vacated the stay as to both Big Land and L & N in September 1978, and L & N once again commenced foreclosure proceedings.

5. In *Stenehjem v. Cho,* 631 P.2d 482, 488 (Alaska 1981), we observed that a subordinating seller's security often is dependent upon the success of the purchaser in developing the property. If the purchaser diverts the proceeds of the senior construction loan, or if the market value of the improvements is less than expected, the value of the property may be insufficient to satisfy both the senior and the subordinating seller's claims upon foreclosure. Although no court has gone so far as to suggest that a senior lienholder, under penalty of losing its senior status, is a guarantor of the success of a construction project, a number of courts have agreed that the senior lienholder must act in good faith and take measures, such as ensuring that the loan proceeds are not diverted by the purchaser-borrower, to protect the subordinated lienholder's security. *See, e.g., Middlebrook-Anderson Co. v. Southwest Sav. & Loan Assoc.,* 18 Cal.App.3d 1023, 96 Cal.Rptr. 338 (1971); *Hyatt v. Maryland Fed. Sav. & Loan Assoc.,* 42 Md.App. 623, 402 A.2d 118 (1979); *Cambridge Acceptance Corp. v. Hockstein,* 106 N.J.Super. 435, 246 A.2d 138 (Ct.App.Div.1968) (per curiam). *See also Fikes v. First Fed. Sav. & Loan Assoc.,* 533 P.2d 251 (Alaska 1975), where this court placed a similar duty upon a construction lender which had prior knowledge of a third party's interest; the case did not involve a subordination agreement, but its principle may be applicable to subordination agreements.

Big Land claims that L & N, as a construction lender, owed it three implied duties arising out of the subordination agreement. These duties will be discussed separately.

### A. *The duty to monitor CEI's use of the construction loan.*

Big Land concedes that "[t]here was no evidence presented to the lower court that [the loan proceeds were] used for anything other than development of the property." This concession accurately describes the state of the record upon which the superior court granted summary judgment against Big Land. Thus, we find no merit in this contention. If the loan proceeds were used to construct the hotel, L & N could not have breached any implied duty on its part to ensure that the loan proceeds were used by CEI to pay construction expenses.[6]

### B. *The duty to administer the loan with due care and in a conventional manner.*

Here again our review of the record persuades us that Big Land failed to present any evidence as to what L & N did or failed to do prior to withdrawal of the Old Colony loan commitment which might have jeopardized the long-term financing,[7] much less that L & N's actions departed from convention or were taken without due care.[8]

### C. *The duty to avoid taking actions which would increase the risk that CEI would default on the loan.*

Big Land argues that L & N was obligated not to act in a manner which increased the risk that CEI would default on the senior construction loan, and that several agreements between L & N and CEI materially increased that risk.

Shortly after Old Colony withdrew its commitment to provide long-term financing, L & N and CEI entered into an agreement which modified the repayment terms of the $2,600,000 loan. Big Land argues that the amended note significantly increased the risk of default.

The term of the amendment to which Big Land objects is that which changed the interest rate from 11%[9] to a floating rate of two percent over prime. Big Land implies that the interest rate under the amendment exceeded that of the original note, that escalating interest payments magnified the risk that CEI would be unable to repay the L & N loan, and that CEI would fall behind on its other obligations. Assuming that Big Land might be entitled to relief if it could show that the 1975 amendment to the note increased the interest rate, the record indicates that the amendment rate of two percent over prime

---

**6.** Big Land does not dispute that $1,500,000 of the L & N loan was used to pay Big Land's creditors.

**7.** The record indicates that either L & N or CEI actually convinced Old Colony to extend its loan commitment for several years after September 21, 1972, the date on which the commitment was to have expired.

**8.** There is, however, evidence tending to show that, after Old Colony backed out, both L & N and CEI made repeated attempts to find alternative long-term financing. Perhaps the most telling observation concerning the problems involved in obtaining long-term financing is Edna Cox's statement that the hotel was plagued with a bad reputation because of numerous fires:

> We've had very interested parties[;] usually it's that two different banks were going to give us the commitment. And, it seems like when they contacted the bank up here, whoever the banker was, I've never been able to

find out, would say, "Well, don't touch them. That's the old Goldrush that burned four or five times." We really accumulated, not only our own three fires, but they blamed us for the other two previous fires. So, it was a bad package to sell.

We note that Big Land appears to be arguing that L & N must have done something wrong because Old Colony withdrew its loan commitment which was conditioned upon completion of the hotel, at a time when only two weeks' work was necessary to complete the hotel. Even assuming that completion of the hotel was delayed for several years, Big Land did not show that such delay could be attributed to misconduct or lack of care on L & N's part.

**9.** The terms of the original note provided for interest at 15% after default, and thus Big Land is not entirely correct in contending that the rate would have been 11% had CEI and L & N not agreed to amend the note.

was well below the 11% rate prescribed by the original note. Thus, we conclude that there is no merit in Big Land's contention that L & N breached a duty owing to it by virtue of the modification of the interest rate on the CEI loan.

In addition to the foregoing, Big Land argues that L & N increased the risk that CEI would default on the loan by entering into a forbearance agreement with CEI in 1977. In May 1977, L & N and CEI entered into an agreement by which L & N agreed not to proceed with its foreclosure because CEI had found a buyer willing to pay $4,000,000 for the hotel, an amount sufficient to retire both the L & N and the Big Land debts. A similar agreement was executed in August 1977. Big Land asserts that these forbearance agreements jeopardized its position. In this regard Big Land is claiming that L & N should have foreclosed rather than giving CEI a chance to sell the hotel. Even assuming that this argument were credible, Big Land nonetheless has made no showing that an immediate foreclosure would have left it in a better position.

Alternatively, Big Land argues that the forbearance agreements demonstrate L & N's lack of good faith because those agreements set forth a schedule according to which CEI was to pay past and current expenses and debts. The schedule specifically provided that CEI was not to make payments on indebtedness which was subordinate to L & N's loan. Again the record fails to disclose how this provision impaired Big Land's interests. CEI had made no payments on the Big Land loan in the preceding three years and neither intended, nor had the money, to make further payments on that loan at the time that it

entered into the forbearance agreements with L & N.

Thus, we conclude that as to the issue of conditional subordination, Big Land did not meet its obligation to "set forth specific facts showing that [it] could produce evidence reasonably tending to dispute or contradict [L & N's] evidence and thus demonstrate that a material issue of fact exists," *State v. Green,* 586 P.2d 595, 606 n. 32 (Alaska 1978). We therefore hold that entry of summary judgment against Big Land was proper as to any claims for relief based on the doctrine of conditional subordination.[10]

## II.

### WAS BIG LAND ENTITLED TO RESCIND THE SUBORDINATION AGREEMENT ON THE GROUND THAT OLD COLONY DID NOT PROVIDE LONG–TERM FINANCING?

Big Land argues that the superior court erred in granting summary judgment when there existed genuine issues of material fact as to whether Big Land was entitled to rescind the subordination agreement. The primary thrust of Big Land's argument is that the availability of long-term financing from Old Colony was a material element of its agreement to subordinate, and that it therefore is entitled to rescind the subordination agreement for breach of a material condition.[11]

A. *Would Big Land's note have been paid from the proceeds of the Old Colony loan?*

Big Land first asserts that the only reason it agreed to subordinate its deed of

10. Big Land also argues that L & N wrongfully interfered with Big Land's attempts to foreclose its $250,000 Deed of Trust. Big Land made no showing that L & N's action in preventing Big Land from foreclosing its junior security interest was the product of ill will or malice. In our view, L & N was privileged to object to, as well as to take steps to block, Big Land's attempt to foreclose its junior security interest. *Compare Bendix Corp. v. Adams,* 610 P.2d 24, 30 (Alaska 1980). Given L & N's significant and senior

(relative to Big Land) financial interest in the property, it had (absent ill will or malice) the right and privilege to take whatever reasonable steps it deemed necessary to protect its economic interest in the property.

11. A step in legal reasoning is omitted from Big Land's argument. Essentially, it demands: (1) reformation of the subordination agreement to include a condition, then, (2) rescission for failure of that condition.

trust to L & N's trust deed was because it expected that its $250,000 loan would be repaid from the proceeds of the long-term financing to be provided by Old Colony, and that therefore the subordination agreement is without effect because the Old Colony financing did not materialize.

The $250,000 note executed by CEI in favor of Big Land provided for five annual payments of interest and a lump-sum payment of principal at the end of the fifth year. The note contained clauses which accelerated the maturity date upon sale of the hotel or upon CEI's obtaining long-term financing of at least $2,900,000. It is undisputed that the only long-term financing contemplated by the parties at the time of the sale was the Old Colony financing, which was for only $2,600,000. Thus, under the terms of the note Big Land would not have been entitled to payment had the Old Colony commitment been honored because that commitment was for less than $2,900,-000. The subordination agreement itself contains no terms stating that Big Land's agreement to subordinate was conditioned upon repayment of its loan from the proceeds of the Old Colony financing; indeed, Big Land's general manager testified that the parties, when negotiating the terms of the subordination agreement, selected $2,900,000 as the amount of the senior lien because everyone was aware that, unless long-term financing in excess of that amount were obtained, the proceeds of that financing would not be sufficient to repay both the L & N loan plus interest and the Big Land loan.

Notwithstanding the fact that none of the relevant documents, which were reviewed and approved by Big Land's attorney, provide that Big Land's note was to have been repaid from the proceeds of the Old Colony financing,[12] Big Land argues that L & N and CEI represented that the note would be repaid from those proceeds and that it agreed to subordinate in reliance on those representations. Here again there is no evidence in the record indicating who, if anyone, made such a representation on behalf of L & N, and thus Big Land's allegation fails as to L & N for want of support. In view of the unambiguous terms of the subordination agreement, we conclude that the superior court correctly rejected Big Land's contention that its agreement to subordinate was expressly conditioned upon payment of its loan from the proceeds of Old Colony's financing.

B. *Did Old Colony's failure to provide long-term financing defeat the parties' reasonable expectations?*

Big Land's final argument is that all parties to the sale of the hotel and the loan and subordination agreements were operating under the assumption that Old Colony would provide permanent financing at some time in the not-too-distant future. Big Land asserts that, even had its note not been repaid from the proceeds of the Old Colony loan, its position would have been improved significantly had that loan been made, since the likelihood of CEI's defaulting on a twenty-year mortgage was far less than the likelihood of default on L & N's short-term construction loan. Big Land claims that we should interpret the subordination agreement in light of this factor and set that agreement aside because the parties' reasonable expectations were defeated when Old Colony withdrew its commitment.

There is no doubt that Big Land, CEI, and L & N expected that Old Colony would provide long-term financing; thus the only real question is whether, as a matter of law, Big Land is entitled to avoid the subordination agreement on the ground that Old Colony backed out. Stated differently, the pertinent question is whether Big Land or

12. In response to L & N's requests for admissions, Big Land agreed that the subordination agreement was not ambiguous. In the instant case, the subordination agreement is completely integrated. This factor furnishes an additional ground for concluding that Big Land is not entitled to relief on the basis of its assertion that its subordination agreement was conditioned upon the receipt of long-term financing from Old Colony. *Johnson v. Curran*, 633 P.2d 994, 996 (Alaska 1981); *National Bank of Alaska v. J.B.L. & K. of Alaska, Inc.*, 546 P.2d 579, 582–83 (Alaska 1976).

L & N must bear the burden of an event which, on this record, was not the fault of either of them.[13]

The few courts that have considered this kind of situation have concluded that a lender who advances funds in reliance on a subordination agreement is entitled to prevail, either because the subordinated party is estopped from denying his agreement to subordinate or because the senior lienholder is likened to a bona fide purchaser. *See Dreckshage v. Community Federal Savings & Loan Association*, 555 S.W.2d 314 (Mo. 1977) (en banc); *Comptroller v. Gards Realty Corp.*, 68 A.D.2d 186, 416 N.Y.S.2d 821 (1979) (per curiam). We agree with these authorities and hold that Big Land was not entitled to any relief because it turned out that Old Colony did not provide long-term financing.

AFFIRMED.

CONNOR, J., not participating.

---

13. Although Big Land seeks "merely" rescission of the subordination agreement, obviously it is not possible to restore the parties to their pretransaction positions, as rescission is designed to do. Big Land's senior status could, of course, be reinstated, but it is not possible to undo the $2,600,000 loan made by L & N in reliance on Big Land's agreement to subordinate.